Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff-employee and defendant-employer at the time of the alleged occupational disease.
3. Cigna Insurance Company was the carrier at risk at the time of the alleged occupational disease.
4. Plaintiff's average weekly wage is to be determined by an Industrial Commission Form 22, admitted into evidence as Stipulated Exhibit #7.
5. Plaintiff received $55.00 in short term disability through an employer funded disability plan.
6. A complaint filed by plaintiff in Superior Court on 16 September 1992, File Number 92 CVS 5477, is admitted into evidence as Stipulated Exhibit #2.
7. Three letters from Glenn Harris, Employee Relations Manager at defendant-employer, to plaintiff dated 4 June 1992, 11 June 1992 and 8 July 1992 are admitted into evidence as Stipulated Exhibit #3.
8. Plaintiff's recorded statement of 30 June 1992 is admitted into evidence as Stipulated Exhibit #4.
9. A letter from plaintiff to the North Carolina Industrial Commission, dated 30 June 1994 and received 7 July 1994, is admitted into evidence as Stipulated Exhibit #5.
10. Defendant's responses to plaintiff's discovery are admitted into evidence as Stipulated Exhibit #6.
11. Plaintiff's medical records concerning this claim, received by the undersigned 14 April 1997, and consisting of the following, are admitted into evidence.
1) Highsmith-Rainey Hospital;
2) Cape Fear Valley Medical Center;
3) Dr. Noralean Williams;
4) Dr. Barry White;
5) Dr. Martin Chipman;
6) Dr. Robert Allen;
7) Dr. Gwenesta Melton;
8) Dr. Horace Miller, IV;
9) Schultz Chiropractic;
10) Dr. Fred Stowe, Jr.;
11) Dr. Larry Kilgore;
12) Dr. Jack Young;
13) Dr. Zane Walsh;
14) Dr. Tomaszek;
15) Dr. Stanley Gilbert;
16) Dr. Vijay Mehta.
 RULINGS ON EVIDENTIARY MATTERS
The objections contained within the depositions of Dr. Fred Stowe and Dr. Martin Chipman are ruled upon in accordance with the applicable provisions of the law and the Opinion and Award in this case.
 ***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows
 FINDINGS OF FACT
1. At the time of hearing, plaintiff was a 42 year old female who had been employed by defendant-employer part-time in 1987 and full-time since 1988. Plaintiff performed various duties for one or more months and eventually went to the chuck section of the assembly line the beginning of 1989. Plaintiff worked in this section until her termination from defendant-employer in 1992.
2. Plaintiff's job duties as a production lineman in the chuck department included working the "in and out" machine that checked alignment of drill chucks. A chuck is the top piece of the power drill; each chuck weighed approximately six ounces. Plaintiff routinely picked up two to three chucks in her hand, aligned the chucks between her fingers and then inserted each individual chuck into a machine that opened the chucks. Plaintiff would then inspect the interior of each chuck and reinsert the chucks into the machine to close the chuck.
3. Plaintiff would run approximately two thousand (2,000) to four thousand (4,000) chucks per eight hour shift. Sometimes plaintiff did as many as five thousand (5,000) chucks per shift. The plaintiff received three breaks during each eight hour shift: two ten-minute breaks and one thirty-minute break. However, plaintiff was not always able to take her breaks. If she got behind in her work, she would have to catch up in order not to slow down the entire line.
4. On 18 September 1991, plaintiff was involved with an "incident" with two North Carolina State Highway Patrolmen. During the altercation, plaintiff suffered injuries to her hands, shoulders and back. The incident occurred after one of the patrolmen stopped plaintiff for speeding. A verbal exchange ensued between plaintiff and the officer, who called for back-up. When he arrived on the scene, the second officer handcuffed and arrested plaintiff. After being handcuffed by the officer, plaintiff was involved in an altercation with the officers in which she was grabbed by the officer and jerked up by the handcuffs. Plaintiff filed an action against the State claiming she suffered serious and painful bodily injuries, great pain and suffering, emotional distress, mental anguish, permanent injuries and incurred large medical bills as a result of the incident. The handcuffs the patrolmen placed on plaintiff were too tight and caused her hands to swell.
5. Plaintiff was not able to work from 18 September 1991 through 21 October 1991 due to the injuries she received during the altercation with the officers.
6. Plaintiff filed a verified complaint against the two officers in regard to the altercation, and verified the contents of the complaint were true.
7. On 10 May 1993, after a jury trial plaintiff was convicted of speeding, driving with an expired license and resisting arrest. These convictions arose from the September, 1991 incident. Plaintiff spent approximately one month in jail in May and June, 1993.
8. After the incident on 18 September 1991, plaintiff received emergency room treatment for injuries sustained in the altercation with the highway patrolmen. Dr. Noralean Williams treated plaintiff on 27 September 1991 for injuries to her hands, arms and back. These injuries are not related to or caused by plaintiff's employment with defendant-employer.
9. After 21 October 1991, plaintiff returned to her same position at defendant-employer. On April 1992, plaintiff reported to Cape Fear Valley Hospital Emergency Room complaining of right shoulder and right arm pain for approximately six months. These records also report injury to her hand. Plaintiff was given a note to be out of work for three days.
10. Dr. Noralean Williams treated plaintiff from 9 April 1992 to 14 April 1992 and excused her from work due to shoulder, neck, arm and hand pain.
11. On 22 April 1992 plaintiff reported to Cape Fear Valley Memorial Hospital Emergency Room with pains shooting down the side of her neck, left side numbness and arm numbness. Plaintiff was provided a note to stay out of work one day.
12. On 23 April 1992 plaintiff sought treatment from Dr. Barry White, a neurologist, complaining of a left-sided headache with left-sided numbness on her face, arm and leg. A brain scan that same date was normal.
13. On 24 April 1992 plaintiff sought treatment from Highsmith-Rainey Hospital Emergency Room complaining of arm pain, right arm numbness and that her fingers had felt broken for approximately four (4) weeks. X-rays of plaintiff's back and hands were unremarkable, except for a tiny benign cyst in plaintiff's right wrist. Plaintiff received a note to be out of work until 27 April 1992.
14. On 27 April 1992 plaintiff sought treatment from Highsmith-Rainey Hospital Emergency Room complaining of high blood pressure. Plaintiff did not receive a note excusing her from work.
15. On 4 May 1992 plaintiff had a normal nerve conduction study on left median and ulnar nerves, performed by Dr. Gilbert. A 19 May 1992 visit to Dr. Stowe also revealed normal nerve conduction studies.
16. On 6 May 1992 plaintiff reported to Highsmith-Rainey Emergency Room complaining of right shoulder pain for approximately one week. On 7 May 1992, plaintiff saw Dr. Mehta complaining of pain and weakness in both hands and both shoulders. Dr. Mehta recommended plaintiff rest at home until the pain was relieved.
17. Plaintiff failed to report to work for defendant-employer on 7 May 1992 and failed to notify the defendant-employer concerning her status. Plaintiff spoke with Glenn Harris on 5 June 1992 and 8 June 1992 but failed to follow-up with a doctor's note as requested. Effective 8 July 1992, plaintiff's employment with defendant-employer was terminated.
18. On 11 September 1992 plaintiff sought treatment from Dr. Chipman, a neurologist, who diagnosed plaintiff with mild carpal tunnel syndrome, although plaintiff did not have a definite Tinel's or Phalen's signs. On 1 March 1993 and 3 September 1993, additional nerve conduction studies were performed and both times the results were normal.
19. Follow-up nerve conduction studies on 19 November 1993, performed by Dr. Jack Young, revealed no evidence of carpal tunnel syndrome.
20. Plaintiff saw Dr. Glen Subin, an orthopaedist, on 20 February 1997. Although plaintiff's symptoms are consistent with carpal tunnel syndrome, the physical findings and nerve conduction studies do not support a diagnosis of carpal tunnel syndrome.
21. Plaintiff has held various jobs intermittently since her termination by defendant-employer. The Deputy Commissioner did not accept plaintiff's testimony that she is unable to work due to carpal tunnel from her duties at defendant-employer as credible based on her demeanor, her medical records and other credible evidence of record. The Full Commission declines to reverse the Deputy Commissioner's credibility decision and therefore finds that plaintiff's testimony was not credible.
22. Although plaintiff's duties with defendant-employer were repetitive in nature, the greater weight of the medical evidence does not support that plaintiff's alleged hand problems arose out of her employment with defendant-employer. Plaintiff's symptoms did not arise until after the September, 1991 incident with the highway patrolmen, when she was jerked up by the handcuffs and the cuffs were so tight that her hands swelled and she was unable to work for one month. Carpal tunnel syndrome may arise from trauma to the hands. It is just as likely, if not more so, that plaintiff's hand problems arose from the 18 September 1991 incident rather than from her employment with defendant-employer.
23. Additionally, the greater weight of the medical evidence supports that plaintiff was unable to work based on back and neck problems, rather than problems to her hands. At the time plaintiff received treatment from Dr. Chipman, her hands were an occasional problem.
 ***********
Based on the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In 1992, plaintiff's complaint of carpal tunnel syndrome did not result from an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to prove by the greater weight of the evidence that plaintiff's problems with her hands in 1992 were related to causes and conditions which are characteristic of and peculiar to plaintiff's employment with defendant-employer. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff is, therefore, entitled to no compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-2(6); N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is, DENIED.
2. Each side shall bear its own costs.
This the ___ day of October 1998.
 S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ ___________________ J. HOWARD BUNN JR., CHAIRMAN
S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
LKM/bjp